UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

**Not for Publication**

AMERICAN FIRE AND CASUALTY COMPANY,

    *Plaintiff,*

v.

CRUM & FORSTER SPECIALTY INSURANCE COMPANY,

    *Defendant.*

Civil Action No. 2:14-cv-04696

**OPINION**

## John Michael Vazquez, U.S.D.J.

The present matter comes before the Court on two motions: (1) Plaintiff American Fire and Casualty Company's ("American Fire" or "Plaintiff") motion for summary judgment; and (2) Defendant Crum & Forster Specialty Insurance Company's ("Defendant" or "Crum & "Forster") motion for summary judgment, both pursuant to Federal Rule of Civil Procedure 56.[1] Plaintiff also seeks fees and costs. At different times, both parties provided insurance coverage for Elite Construction Company ("Elite"). Plaintiff contends that Defendant is responsible for a portion of Elite's defense and settlement costs stemming from an underlying suit. Defendant takes a contrary

---

[1] Plaintiff's brief in support of its motion for summary judgment will be referred to hereinafter as "Pl. Br." (D.E. 30); Defendant's opposition to Plaintiff's motion will be referred to hereinafter as "Def. Opp'n" (D.E. 36); and Plaintiff's reply brief will be referred to "Pl. R.Br." (D.E. 37).

Defendant's brief in support of its motion for summary judgment will be referred to hereinafter as "Def. Br." (D.E. 29-1); Plaintiff's opposition to Defendant's motion will be referred to as "Pl. Opp'n" (D.E. 35); and Defendant's reply brief will be referred to as "Def. R.Br." (D.E. 38).

view. This motion was decided without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. The Court has considered the parties' submissions, and for the reasons stated below, the Court denies both Plaintiff and Defendant's motions for summary judgment as well as Plaintiff's motion for fees and costs.

## I. **BACKGROUND**

This case stems from an underlying action brought by K. Hovnanian Construction Management, Inc. ("Hovnanian") in Pennsylvania state court.[2] Hovnanian sought damages from several defendants,[3] including Elite, for construction defects at the Four Seasons at Hershey's Mill – Yardley Village ("the Project") located in West Chester, Pennsylvania. *See* Declaration of Denise DePekary ("DePekary Decl.") (D.E. 29-3) Ex. A ¶¶ 170-73. Hovnanian, the builder, hired Elite as a window subcontractor, and Elite agreed to perform "framing work and installation of windows, flashing and waterproofing." *Id.* ¶¶ 170-71. Hovnanian alleged that Elite improperly installed windows in 138 homes in the Project, resulting in water damage to the homes' interiors. *Id.* ¶¶ 170-75. In failing to properly seal and flash the windows it installed, Hovnanian alleged that Elite breached their agreement. *Id.* ¶¶ 172-73. As a result, Hovnanian claimed it was required to "perform, at great expense, significant and substantial repair work to the homes . . . to correct

---

[2] The underlying matter was filed in Chester County's Court of Common Pleas and was entitled, *K. Hovnanian Construction Management, Inc. et al. v. Pennoni Asoc, et al.*, Civil Action No. 09-10654.

[3] The other defendants in the underlying action were: Pennoni Associates (project engineer), Lyons & Hohl, Inc. (project site contractor), B&M Landscaping Co., Inc. (project landscaping company), Environmental Materials d/b/a Environmental Stone Works ("Stone Works") (manufacturer/installer of stone veneer), A-1 Bracket, Inc. ("A-1 Bracket") (installer of stucco exterior façade), J.M. Pereria & Sons, Inc. (concrete and masonry foundation contractor), and Metal Tech Roofing and Siding (roofing contractor). DePekary Decl. Ex. A ¶¶ 3-11; Ex. O, at 3. The Falcon report found that three parties were responsible for the stone, caulking and flashing issues with the windows that resulted in water damage: Elite, A-1 Bracket, and Stone Works. DePekary Decl. Ex. O, at 13.

2

the damages caused by Elite." *Id.* ¶ 174. American Fire defended Elite in the underlying lawsuit. DePekary Decl. Ex. K ¶ 18; *see also* Plaintiff's Statement of Material Facts ("PSOMF") (D.E. 30) ¶ 13. In this matter, American Fire seeks a declaration that Crum & Forster owes defense and indemnification costs to Elite and requests contribution from Crum & Forster for its purported share of the defense and indemnity expenses in the underlying action.

Elite performed construction work for Hovnanian on the Project, which was substantially completed in June of 2001. PSOMF ¶ 7. American Fire issued an insurance policy to Elite which covered the period from June 1, 2001 (the date the work was completed at the project) to June 1, 2003. *Id.* Crum & Forster also issued a general commercial liability insurance policy to Elite for two policy periods: from June 1, 2003 through June 1, 2004 and then from June 1, 2004 through June 1, 2005. DePekary Decl. Ex. B. Harleysville Insurance Company issue a policy to Elite after the Crum & Forster's policies. PSOMF ¶ 9. American Fire and Harleysville provided defense to Elite in the underlying case and also contributed to a settlement. *Id.* ¶ 13.

The critical issue in this case turns on when water damage, caused by Elite's allegedly faulty workmanship, "manifested" at the Project. Unit-owners at the Project provided documentation of water infiltration in their residences. *See* DePekary Decl. Ex. G. These notes date from 2001 through 2007[4], and some include notation of specific leaks in or around the windows installed by Elite. *See, e.g.*, DePekary Decl. Ex. G, at 12 (note from unit-owners Joseph and Linda Feronni stating that their unit has water intrusion "around [their] Master Bedroom window and the single casement window in [their] lower level"); *id.* at 10 (letter from unit owner

---

[4] Many of the notes in the latter part of this time frame refer back to prior notes and service tickets that occurred soon after the unit-owners moved into their homes. *See* Def. Opp'n at 2-17. The unit-owners moved into their homes sometime between 2000 and 2002. *See* Defendant's Statement of Material Facts ("DSOMF") (D.E. 29-20) ¶ 27.

3

Meg McCann stating that the leakage problem was "due to the stucco not applied properly around the bedroom windows"). As would be expected from non-experts, the documents do not indicate the actual cause of the leakage and instead indicate the location of the water. Other notes refer to more generalized water leakage but fail to indicate its origin. *See, e.g.,* DePekary Decl. Ex. G (note from unit-owner Janet Day which states that she had noticed a water mark on a family room ceiling and "suffered from other water intrusion issues"); *id.* at 13 (letter from unit owner Harold Carstensen stating that he "[has] not been able to determine where on the roof the water is initially entering").

On January 25, 2008, moisture testing was performed at the Project. *See* Declaration of Kyle Heisner ("Heisner Decl.") (D.E. 35-1) Ex. S, Ex. T. This testing, done by the Falcon Group, found a lack of sealant where the window trim met the windows and showed deficiencies related to the flashings[5] and sealant around the windows. *Id.* Thus, there was evidence of water infiltration spanning from 2001 through 2008. However, Falcon's report in 2008 was the first expert opinion as to its cause.

## II. PROCEDURAL HISTORY

Plaintiff initiated the current action on July 28, 2014. D.E. 1. Defendant answered Plaintiff's complaint on September 9, 2014, alleging numerous affirmative defenses and a counterclaim seeking a declaratory judgment "declaring the rights and obligations of the parties under policies of insurance" issued by each party to this action. D.E. 6. After the close of discovery, each party moved for summary judgment. D.E. 29, 30. Both parties oppose each other's motions. D.E. 35, 36.

---

[5] The parties do not define the term flashing, and the Court assumes that the parties are referring to thin material that is installed at necessary locations to prevent water from entering a unit.

4

## III. **STANDARD OF REVIEW**

A moving party is entitled to summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact in dispute is material when it "might affect the outcome of the suit under the governing law" and is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude granting a motion for summary judgment. *Id.* "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)). A court's role in deciding a motion for summary judgment is not to evaluate the evidence and decide the truth of the matter, but rather "to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

The showing required to establish that there is no genuine issue of material fact depends on whether the moving party bears the burden of proof at trial. On claims for which the moving party does not bear the burden of proof, the movant must demonstrate "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In contrast, "'[w]hen the *moving* party has the burden of proof at trial, that party must show *affirmatively* the absence of a genuine issue of material fact.'" *In re Bressman*, 327 F.3d 229, 238 (3d Cir. 2003) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1438 (11th Cir. 1991)). This affirmative showing requires the moving party to show that "'on all the

essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party.'" *Id.*

Once the moving party satisfies its initial burden, the burden shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324 (internal quotation marks omitted). To withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict the moving party. *Anderson*, 477 U.S. at 250. "[I]f the non-movant's evidence is merely 'colorable' or is 'not significantly probative,' the court may grant summary judgment." *Messa v. Omaha Prop. & Cas. Ins. Co.*, 122 F. Supp. 2d 523, 528 (D.N.J. 2000) (quoting *Anderson*, 477 U.S. at 249-50)).

## IV. DISCUSSION

Both parties agree that under New Jersey Law, the manifestation trigger theory applies to first-party insurance cases while the continuous trigger theory applies to third-party insurance cases. Pl. Br at 13-15; Def. Opp'n at 21. Plaintiff argues that since the underlying matter was a third-party claim, the continuous trigger theory applies. Pl. Br. at 15. Defendant responds that under either theory, its insurance responsibilities end once the occurrence giving rise to coverage manifests. Def. Opp'n at 20-24.[6]

---

[6] Plaintiff makes two additional arguments: (1) that the damage here falls into Crum & Forster policy's requirement for an "occurrence" causing "property damage;" and (2) that Crum & Forster initially disclaimed liability based on different theories than they now assert. Pl. Br. at 10-12. Defendant responds to Plaintiff's first argument by stating that "the crux of Crum & Forster's disclaimer of coverage to Elite is (and has always been) based primarily on the timing requirements in the relevant Crum & Forster policies." Def. Opp'n at 1. The Court views this assertion by Crum & Foster as admitting American Fire's first point. As to the second issue, "facts outside the complaint may trigger the duty to defend." *SL Indus., Inc. v. Am. Motorists Ins. Co.*, 128 N.J. 188,

6

In the insurance context, a "trigger" refers to an event or occurrence that requires coverage under a policy. *Owens-Illinois, Inc. v. United Ins. Co.*, 138 N.J. 437, 447 (1994) ("[T]he term 'trigger' is merely a label for the event or events that under the terms of the insurance policy determines whether a policy must respond to a claim in a given set of circumstances." (internal quotations and citation omitted)). Depending on the type of policy, New Jersey courts have found different types of triggers to apply. A "continuous trigger" results in continual coverage for the entire time from initial exposure to actual manifestation of the injury or damage. *Id.* at 450; *see also El-Ad Grp. v. Northbrook Prop. & Cas. Ins. Co.*, No. 03-0041, 2006 WL 8406838, at *4 (D.N.J. Mar. 15, 2006) ("The continuous trigger theory "holds that a loss occurs for purposes of coverage continuously from the point in time when the damage actually began to the time when it became manifest."). For example, in a case of asbestos inhalation, the continuous trigger theory results in coverage from the date of the initial exposure through the date the asbestosis manifested. *Owens-Illinois*, 138 N.J. at 450. A "manifest trigger," by comparison, results in coverage only on the date that the damage or injury manifests. *Id.*

The applicable trigger can materially impact the amount of coverage available. In particular, under the continuous trigger theory, coverage may be available under multiple policies. *Id.* In other words, the continuous trigger captures any applicable insurance policy in effect from

---

198 (1992). Thus, "an insurer's duty is measured by the facts," not merely what is pled within the complaint. *Id.* Here, Defendant, in reviewing Hovnanian's complaint (and amendments thereto) in the underlying matter, initially denied coverage based on a different trigger theory and based on its interpretation of the word "occurrence." Through later discovery that theory changed, and now Defendant claims that the damage actually manifested prior to its policy period in 2003. American Fire essentially argues that it was litigating against a moving target and that Crum & Foster first reached a conclusion – Elite was not covered – and then searched for facts and legal theories to support its conclusion. However, a party can change its theory of the case in light of additional information provided in discovery.

7

the date of first exposure to manifestation. The manifest trigger, on the other hand, only applies to the policy in effect on the date that the injury or damage manifests. However, under either theory, the manifestation date is critical because the insured is not entitled to coverage after that date.

In *Winding Hills Condominium Association, Inc. v. North American Specialty Insurance Co.*, 332 N.J. Super. 85, 93 (App. Div. 2000), the New Jersey Appellate Division determined that the manifest trigger rule applies in first-party insurance cases while the continuous trigger theory applies in third-party coverage cases. The parties here do not dispute that this is a third-party insurance case, because it results from Hovnanian's suit in the underlying matter, or that the continuous trigger rule applies. *See* Pl. Br. at 14 & Def. Opp'n at 20-21. Instead, Defendant simply argues that under either the manifestation or continuous trigger theory, Defendant should prevail. Def. Opp'n at 20-21.[7] Therefore, the Court will apply the continuous trigger rule.[8]

---

[7] The Court notes that this is not a traditional case of first-party or third-party insurance in the sense that it is one insurance company suing another concerning an entity that both insured during different periods. However, the issue was not raised by either party. Moreover, the underlying case was clearly a third-party matter.

[8] The policy rational for applying the continuous trigger theory in *Winding Hills* was based largely on "considerations of public policy respecting the public health interest in mass exposure toxic tort [and environmental pollution] cases." 332 N.J. Super. at 91. The current matter does not involve either a toxic tort or long-term environmental pollution. It is a construction defect case. Nonetheless, New Jersey courts, and courts interpreting New Jersey law, distinguish *Winding Hills* by the first-party vs. third-party difference rather than the nature of the underlying damage or injury. *See, e.g., PPG Indus., Inc. v. Am. Home Assur. Co.*, No. A-2424-05T2, 2007 WL 2350646, at *10 (N.J. App. Div. Aug. 20, 2007) (stating that *Winding Hills* held that "the continuous-trigger rule applies to third-party claims and does not apply to first-party claims"); *Proformance Ins. Co. v. Riggins, Inc.*, No. A-2846-08T1, 2010 WL 1657385, at *3 (N.J. App. Div. Apr. 27, 2010) (distinguishing *Winding Hills* because it applied to first-party, not third-party insurance claims); *see also Cypress Point Condo Ass'n v. Selective Way Ins. Co.*, No. HUD-L-936-14, 2015 N.J. Super. Unpub. LEXIS 721 (Law Div. Mar. 30, 2015) (applying the continuous trigger theory to a third-party property claim involving defective construction at a condominium); *cf. El-Ad Grp.*, 2006 WL 8406838, at *4 ("[T]he continuous trigger theory[ is] is typically used in third-party

As noted, the date that the damage manifests is necessary in determining the scope of liability under the continuous trigger theory. Under New Jersey law, the loss is "manifest" when "the injury becomes reasonably apparent or known to the claimant." *El-Ad Grp.*, 2006 WL 8406838, at *5. In *Winding Hills*, the court determined the manifestation date to be when the plaintiff was "adequately apprised . . . of the general scope and causes" of the loss. 332 N.J. Super. at 89. Furthermore, "the fact that additional problems of the same type were uncovered at a later date [did] not affect setting the manifestation date earlier because the plaintiff was aware of the 'essential difficulties' at the earlier date." *El-Ad Grp.*, 2006 WL 8406838, at *5 (citing *Winding Hills Condo. Ass'n*, 332 N.J. Super. at 90).

Here, the parties dispute the date of manifestation. *Compare* Def. Br. at 18-19 (alleging manifestation began prior to June 1, 2003, when the Crum & Forster policy was first issued) *with* Pl. Opp'n at 11 (stating that "the property damage . . . did not 'manifest' until January 2008"). Both parties agree that policies in place after the date of manifestation are not subject to coverage. *See* Def. R.Br. at 1; Pl. Opp'n at 11. Thus, if the manifestation date is prior to 2003, as Defendant suggests, then Defendant is not liable under its subsequently issued policies. On the other hand, if the manifestation date is in 2008, then both Plaintiff and Defendant would be liable for the damage that occurred within their respective policy periods.

In support of Defendant's contention, it cites to "ongoing complaints" by unit owners of water infiltration "coming specifically from the windows [] installed by Elite." Def. R.Br. at 7. This, alleges Defendant, demonstrates that Elite's work caused water infiltration prior to the inception of the Crum & Forster policies. Def. Br. at 19. Additionally, Defendant contends that

---

coverage cases[.]"). Additionally, neither party contests that the continuous trigger theory applies. Therefore, the Court will apply the continuous trigger theory.

9

the documentation shows that "both [] Hovnanian and Elite were aware of the alleged defects and water infiltration stemming from Elite's work prior to the Crum & Forster policy period(s)." Def. R.Br. at 6-7.

Plaintiff seems to argue that an expert is required to determine when "manifestation" occurs. *See* Pl. Opp'n at 12. Plaintiff supports its argument by alleging that the letters sent to Crum & Forster identifying the water issues "do not provide any indication as to the source of the water," and therefore "are not sufficient to establish a pre-policy manifestation." *Id.* at 6. This is because the notes from unit owners fail to demonstrate that "the alleged defective construction by Elite Contractors was discovered or should have been discovered." *Id.* Thus, Plaintiff alleges that the appropriate manifestation date is in January of 2008, when expert moisture testing was performed on the units and the cause of the damage was determined. *Id.* at 12.

In *El-Ad Group v. Northbrook Property & Casualty Insurance Corporation*, Judge Linares confronted the issues of the cause of a loss and when it manifested. 2006 WL 8406838, at *5.[9] The case stemmed from a structural collapse on the plaintiff's property in 2001. *Id.* at *1. Prior to the collapse, there had been many complaints concerning the condition of the property. *Id.* at *1-2. In 1998, cracks were noticed in the ceiling and walls, and an outside expert determined that there had been some "settlement" of the building. *Id.* at *1. Other professionals the same year also concluded that the building's foundation had settled and caused "structural distress." *Id.* In 1999, a tenant complained that the building was sinking, and the tenant had experienced unlevel floors, severe cracks, and windows that were "out of plumb." *Id.* at *2. The town then sent the

---

[9] The court in *El-Ad Group* applied the manifest trigger rule since the underlying policy concerned a first-party property loss claim. *Id.* Nonetheless, the key issue there, as in this matter, was the date of manifestation.

owners a notice that the building was not safe. *Id.* In January 2000, the building owner hired a professional to inject concrete in certain areas to stabilize the building. *Id.* The applicable insurance policy became effective in June 2000, and the building suffered a collapse the following year. *Id.*

The first issue in *El-Ad Group* was whether the loss was due to a "settlement" or a "collapse." *Id.* at *5. If it was due to a collapse, then the plaintiff was covered, but if it was due to a settlement, then plaintiff was not covered. *Id.* The second issue was the date that the damage became manifest. If the loss was manifest prior to the policy period, then the plaintiff lacked coverage. After weighing "numerous tenant complaints," expert reports, and other evidence, Judge Linares determined that there were genuine issues of material fact as to both the nature of the loss and the date the loss was manifest. *Id.* at *6. Thus, the court in *El-Ad Group* found that a reasonable factfinder could find that the loss was either a settlement or a collapse, and that under either scenario, there were facts suggesting that the loss manifested both before and after the effective date of the policy. *Id.* Therefore, Judge Linares denied each party's motions for summary judgment. *Id.*

As to the manifestation date, Judge Linares observed that before the policy, there were numerous tenant complaints, expert reports, and remediation efforts. *Id.* at *5. As a result, the court concluded that there was "evidence prior to the policy start date of June 2000 from which a fact finder could determine that a . . . loss should have been reasonably apparent to [the plaintiff] before this date." *Id.* at *6. Judge Linares also determined that a reasonable factfinder could reach the opposite conclusion, *i.e.* that the loss occurred during the policy period, in light of the evidence. *Id.* Among other evidence, Judge Linares pointed to the fact that the town had only required repairs prior to the damage in 2001 and that no tenants had been forced to vacate before that date. *Id.*

11

Here, as in *El-Ad Group*, a reasonable factfinder could find that the damage manifested prior to Defendant's policy period, but a reasonable factfinder could also find that the damage manifested later. Importantly, when viewing Plaintiff's motion, the Court must make all reasonable inferences in favor of Defendant and then do the reverse when reviewing Defendant's motion. In short, there is a combination of factors, including the unit-owner reports and expert testing, that creates a genuine issue of material factual as to when Elite should have been "reasonably aware" that its actions caused the damage.

In Defendant's favor, the Project was, at a minimum, substantially completed prior to the effective date of Crum & Forster's policies. *See Cypress Point Condo Ass'n v. Selective Way Ins. Co.*, No. HUD-L-936-14, 2015 N.J. Super. Unpub. LEXIS 721, at *15 (Law Div. Mar. 30, 2015) (noting that a factor supporting a finding of manifestation was that the damage occurred soon after the project was substantially completed and eight years before the insurance policy was effective). In addition, there is evidence from unit-owners' written complaints indicating water infiltration beginning in 2001 in the areas worked on by Elite. *See* DePekary Decl., Ex. G (notes from unit owners complaining of water infiltration in 2003), *id.* Ex. N, at 7-8 (note from Joe and Linda Ferroni on December 16, 2002 complaining of water infiltration in and around lower level windows). Thus, when reviewing Plaintiff's motion, and drawing all factual inferences in favor of Defendant, there is evidence from which a reasonable factfinder could conclude that the damage manifested before Defendant's policies.

On the other hand, the only expert report cited indicates that causation was definitively determined *after* Defendant's policies were in effect.[10] Moreover, while there is some evidence

---

[10] The Court does not necessarily agree with Plaintiff that an expert is *required* to establish manifestation. Plaintiff is correct that in many cases, courts look to the date of an expert opinion as conclusively establishing manifestation. *See Winding Hills*, 332 N.J. Super. at 89-90 (observing

that the infiltration stemmed from the areas of work performed by Elite prior to June 1, 2003, *see, e.g.*, DePekary Decl. Ex. G & Ex. N, the letters do not definitively establish that water damage was due to Elite's (as opposed to another contractor's) shoddy work. This is for the simple reason that the owners are not construction experts. In addition, other owner letters fail to indicate the source of water leakage. *See, e.g., id.* Ex. G, at 7 (complaining of water infiltration but not specifying where the water is coming from); *id.* Ex. N, at 2 (complaining of water infiltration coming from areas other than the windows installed by Elite). Additionally, other complaints from unit owners do not definitively indicate when the water infiltration began. *See, e.g., id.* Ex. G, at 12 (letter from Joseph Ferroni in 2007 indicating that "[he has] gotten water intrusion into [his] home countless times over the last 5 years"). Therefore, it is difficult to ascertain the precise date at which the damage became "reasonably apparent or known to the claimant." *El-Ad Grp.*, 2006 WL 8406838, at *5. In sum, when reviewing Defendant's motion, and drawing all factual inferences in favor of Plaintiff, there is evidence from which a reasonable factfinder could conclude that the damage manifested after Defendant's policies.

Finally, Plaintiff requests recovery of attorneys' fees and costs in prosecuting this matter pursuant to New Jersey Rule 4:42-9(a)(6). *See* Pl. Br. at 16. Since the Court is denying Plaintiff's motion for summary judgment, it is not a "successful claimant" as required by Rule 4:42-9(a)(6). *See Rule* 4:42-9(a)(6) (permitting an award of counsel fees in "an action upon a liability or

---

that damage was manifest no later than the date of the expert report although it was "arguable" that manifestation occurred earlier when the problem was first reported). However, as Judge Linares noted in *El-Ad Group*, it appears that an expert report is merely one factor to consider in determining manifestation.

indemnity policy of insurance, in favor of a *successful* claimant") (emphasis added). Therefore, the Court denies Plaintiff's request for attorneys' fees and costs.[11]

### 3. CONCLUSION

For the reasons set forth above and for good cause shown, the Court **DENIES** Defendant's motion for summary judgment and **DENIES** Plaintiff's motion for summary judgment. Additionally, Plaintiff's request for attorneys' fees and costs is **DENIED**. An appropriate form of order accompanies this opinion.

**Date:** April 12, 2017

                                            **JOHN MICHAEL VAZQUEZ**
                                            **UNITED STATES DISTRICT JUDGE**

---

[11] Additionally, Plaintiff moved to strike Exhibit M to the DePekary Declaration from the record pursuant to Rule 56(c). Pl. Opp'n at 6 n.3. Defendant did not respond to Plaintiff's request and the Court did not rely on this exhibit in its Opinion. Therefore, the Court will not address the request at this time.